IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| BARBARA SUMMERLIN | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:06-CV-075-Y |
| | § | |
| BENNETT TRUCK TRANSPORT, L.L.C. | § | |

## FINDINGS AND CONCLUSIONS

Pursuant to Rule 52(a), the Court makes the following findings and conclusions:

### I. FINDINGS OF FACT

1. On August 21, 2001, plaintiff Barbara Summerlin and her husband, Jack,[1] signed an agency agreement with defendant Bennett Truck Transport, L.L.C. ("Bennett"), under which Jack and Barbara agreed to operate a terminal for Bennett as independent contractors.

2. On page five of the agency agreement, the signature page, is found the following:

IN WITNESS WHEREOF, AGENT HAS EXECUTED THIS AGREEMENT ON
THE DAY AND YEAR SET FORTH ABOVE.

AGENT:
**JACK AND BARBARA SUMMERLIN**

(Pl.'s Ex. 1 at 5 [emphasis in original].) Following is the signature of Barbara Summerlin on one line and, immediately adjacent and to the right, is the signature of Jack Summerlin.

3. Accordingly, the agency agreement contract is one between Bennett on the one hand and BOTH of the Summerlins, as a team, on the other.

4. The parties stipulate that the contract is unambiguous and that Georgia law governs its construction. The Court accepts and will enforce that stipulation.

---

[1] Jack Summerlin was also a plaintiff in this action. However, after his death in December 2007, this Court dismissed his claims. *See* FED. R. CIV. P. 25(a).

5. At the time that the contract was signed, Bennett knew that Jack and Barbara had almost always operated as a team when one or both served as terminal agent for Bennett and Bennett's competitors in the mobile-home-transport industry.

6. Thus, Bennett expected, when it contracted with Jack and Barbara, that it would be receiving the combined services of them both in the operation of the Bennett terminal in Alvarado, Texas, and Jack and Barbara understood that Bennett expected this.

7. During the just over four-year existence of the contract, Jack performed various important duties of an agent for Bennett. Specifically, he:

> (1) solicited business;
>
> (2) recruited independent-contractor drivers;
>
> (3) encouraged safety awareness by drivers, including by arranging for safety meetings with drivers assigned to Jack and Barbara's terminal;
>
> (4) inspected vehicles;
>
> (5) settled or helped settle claims;
>
> (6) dispatched drivers and their equipment daily;
>
> (7) conferred with drivers and with the executives at Bennett regarding the operation of the business and the provision of good service to their customers.

8. Bennett knew that Jack was performing these duties, and it was Bennett's expectation that he would be performing them in compliance with the contract between them.

9. Barbara, who mostly handled paper flow and bookkeeping, nevertheless also performed many of the same duties as Jack, as needed, but Jack had the primary role of operating the agency.

10. Bennett rarely dealt with Barbara. The vast majority of its dealings with the Summerlins were with Jack.

11. Jack Summerlin was consistently irascible, often impulsive and profane, and sometimes abusive to drivers, associates, customers, and Bennett executives.

12. Jack's behavior over the duration of the contract became increasingly troublesome to Bennett executives and especially to Jim McDowell, a regional manager for Bennett, who repeatedly was required to mediate and intervene between Jack and his drivers, Jack and other terminal agents and their employees, and Jack and Bennett's customers.

13. On September 6, 2005, Jack became extremely agitated by McDowell's reassignment of two independent-contractor drivers, at the drivers' insistence, to another Bennett terminal, which would result in less commission revenues for Jack and Barbara and greater difficulty for them in taking care of their customers.

14. In his agitation, Jack telephoned McDowell and threatened to terminate the agency contract with Bennett by taking his services, his drivers, and his customers to a competitor.

15. Jack had made such threats to McDowell before when he did not get his way, and McDowell knew that Jack and Barbara had moved from terminal agency to terminal agency freely over the previous two decades.

16. When McDowell refused to rescind his decision to transfer the two drivers, Jack repeated his threats, concluded the telephone conversation with the words "I quit," and hung up the phone.

17. Jack did not, during that conversation, utter the words "I repudiate" or "I terminate my agency agreement on behalf of myself and Barbara." In fact, Jack did not mention any continuing role for Barbara at all.

18. But Jack had apparent authority, based on the four years of Bennett's relationship with Jack and Barbara, to speak for them both.

19. McDowell then did one or both of the following:

(1) He inferred that Jack, on behalf of himself and his co-agent, Barbara, was terminating their agency;

(2) He determined that he (Jim) had good cause to terminate the agency and the authority to do so.

20. McDowell's inferences were fully supported by what he then knew.

21. Barbara, soon after Jack's telephone call to McDowell, spoke with a Bennett executive superior to McDowell and indicated that she wanted to continue to operate the agency without Jack.

22. Bennett refused to allow Barbara to continue to operate the agency without Jack.

23. Because Bennett contracted with BOTH Jack and Barbara to operate the agency and because Jack's services were an important part of the reason Bennett contracted with them, Bennett perceived no obligation to allow Barbara to operate the agency without Jack. As Bennett's counsel stated in a brief closing remark, Bennett "contracted for Simon and Garfunkel" and was unwilling to go forward with only Garfunkel.

24. Jack Summerlin terminated the agency agreement on September 6, 2005, but did not confirm it as provided by the contract.

25. Bennett then terminated the agency agreement for good cause on September 6, 2005.

26. On September 9, 2005, Grant Brooker, Bennett's general counsel, talked to Jack. Jack reiterated that he "quit," but stated that Barbara wanted to continue as the terminal agent. Brooker sent two letters to the Summerlins—one on September 9 and one on September 15—confirming that the agency agreement had been terminated by Bennett.

## II. CONCLUSIONS OF LAW

1. Bennett's termination of its agency agreement with Jack and Barbara Summerlin was lawful under the law of the state of Georgia, the law chosen by the parties in their agency-agreement contract.

2. Bennett had no duty under Georgia law to allow Barbara Summerlin to operate the agency without Jack.

3. Bennett's lawful termination of the agency agreement with Jack and Barbara Summerlin was timely confirmed in writing and was legally effective to complete the lawful termination of the agency agreement.

4. Even if the termination of the agency agreement by Bennett cannot be said to have been timely confirmed by Bennett, under Georgia law, a procedural breach of an agency contract does not void the termination or entitle the agent to recover damages.

5. Plaintiff Barbara Summerlin should take nothing against defendant Bennett.

SIGNED February 12, 2008.

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE